UNITED STATES of America, Plaintiff,

v.

GTE CORPORATION, Defendant.

Civ. A. No. 83–1298.

United States District Court,
D. Columbia.

Dec. 13, 1984.

Jeffrey Blumenfeld, Kevin R. Sullivan, U.S. Dept. of Justice, Washington, D.C., John M. Dempsey, Asst. Atty. Gen., Lansing, Mich., for plaintiff.

C. Daniel Ward, GTE Corp., Stamford, Conn., Kenneth R. Feinberg, Kaye, Scholar, Fierman, Hayes & Handler, Washington, D.C., Chester T. Kamin, Jenner & Block, Washington, D.C., Sean A. McCarthy, Satellite Business Systems, McLean, Va., Lee M. Mitchell, Washington, D.C., James D. Senger, Kirkland & Ellis, Washington, D.C., Herbert E. Marks, State of Hawaii, Squire, Sanders & Dempsey, Washington, D.C., for defendants.

OPINION

HAROLD H. GREENE, District Judge.

On May 4, 1983, the government filed this antitrust action under Section 15 of the

Clayton Act, 15 U.S.C. § 25, challenging the acquisition by GTE Corporation of the telecommunications enterprises of Southern Pacific Company (which operates "Sprint" long distance service)[1] as a violation of Section 7 of the Act, 15 U.S.C. § 18.

The complaint alleged that the effect of the acquisition may be substantially to lessen competition in the provision of interexchange telecommunications services[2] (particularly in those areas where GTE provides local telecommunications services). In addition, the government challenged GTE's provision of information services under section 4 of the Sherman Act, 15 U.S.C. § 4, alleging that it creates a substantial probability that GTE will monopolize these information services in the markets it serves.[3] On the same day the complaint was filed, the government and GTE also filed a proposed consent decree to settle the case. It is that consent decree that is presently before the Court.

## I

### *Factual Background*

The decree, if approved and entered by the Court,[4] would permit GTE to acquire the telecommunications enterprises of Southern Pacific subject to a number of conditions which may be summarized as follows: (1) GTE's local monopoly operations must be kept separate from its long distance and other competitive operations; (2) the GTE Operating Companies[5] may not discriminate among interexchange carriers[6] and they must provide equal access to all competitors on a phased-in basis; (3) the GTE Operating Companies may not provide interexchange services, they may not own facilities used to provide such services, and they must phase out their interexchange operations currently offered in conjunction with AT & T; (4) for a period of ten years, GTE may not acquire any other firm providing interexchange telecommunications services; (5) the GTE Operating Companies may not provide information services except through separate subsidiaries and subject to a number of limitations; (6) in the event that GTE violates the decree, the Department of Justice may return to the Court to seek further relief; and (7) the Court retains jurisdiction to construe, modify and enforce the terms of the decree.

Under section 2(b–h) of the Antitrust Procedures and Penalties Act, 15 U.S.C.

---

1. Southern Pacific's interexchange services were marketed under the name "Sprint" by Southern Pacific Communications Company. Southern Pacific's other telecommunications subsidiary, Southern Pacific Satellite Company, is authorized by the Federal Communications Commission to launch and operate a domestic satellite communications system, a part of which was intended for use in providing Sprint services.

2. Also referred to at times as intercity or long distance services.

3. Such monopolization is claimed to violate section 2 of the Sherman Act, 15 U.S.C. § 2.

4. On June 10, 1983, the Court permitted the merger between GTE and Pacific Communications Company and Southern Pacific Satellite Company to proceed as planned based upon commitments from GTE that, while the matter was pending in Court, (1) it would hold the stock of the acquired entities on its own and not intermingle it with that of GTE affiliates or subsidiaries or sell or transfer it; (2) it would keep separate the assets, stock, and operations of GTE and those of the acquired companies

except for equipment or supplies sold by a GTE entity to them; (3) it would retain all of the assets of the acquired companies "other than pursuant to SPCC obligations existing as of the date of closing or in the ordinary course of business"; (4) it would maintain separate accounting records, payrolls, and banking accounts for the acquired companies; and (5) it would not transfer personnel from the acquired companies to any GTE entity. The Court found that these commitments ensured that the merger could be undone in the event that the Court ultimately found that the merger and proposed consent decree were not in the public interest.

5. These are GTE's local telephone companies equivalent to the Bell Operating Companies of AT & T.

6. The decree also prohibits discrimination among information service providers. The Court's discussion with respect to long distance services shall generally be deemed to include information services. Part IV below analyzes issues specifically relating to information services.

§ 16(b)-(h), the decree does not become effective unless approved by the Court as being in the public interest (see generally, *United States v. AT & T,* 552 F.Supp. 131, 143–53 (D.D.C.1982), *aff'd sub nom., Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).[7] Accordingly, the parties, in compliance with the Act, submitted the decree to the Court for its approval.[8] Also in compliance with the Act, the Department of Justice filed and published a competitive impact statement which described the events that gave rise to the alleged antitrust violations and which explained the restrictions contained in the proposed decree and their anticipated effect on competition.[9] The Court thereafter identified a number of issues on which oral argument would be helpful, and it heard argument on those issues from the Department of Justice, GTE, and the principal opponents of the proposed settlement.

## II

### The AT & T Precedent

#### A. General

The antitrust theories underlying the government's lawsuit in this case are similar to those which were advanced in the *AT & T* case. It is the government's position here as it was there that when a single firm provides in the same market both local monopoly telecommunications services and competitive long distance services, it has the incentive and the ability to foreclose or to impede competition in the competitive (or potentially competitive) market by discriminating in favor of its own long distance carrier.[10] The government also urges, as it did in *AT & T,* that the integration of long distance and local telecommunications services in a single enterprise creates the incentive and the ability to cross-subsidize the competitive operations with profits from the regulated monopoly operations and thereby to eliminate or impair competition.[11]

According to the Department of Justice, the objective of the proposed decree in this case, like that of the decree in the *AT & T* case, is to circumscribe this kind of interference with the free competitive market by such practices. To achieve that objective, the decree herein parallels the *AT & T* decree in several respects.

For example, both the Bell Operating Companies and the GTE Operating Companies are required under the respective decrees to provide equal access to all competing interexchange carriers and information service providers, and they are prohibited from discriminating against any such com-

7.  GTE and Southern Pacific have also applied to the FCC for authority to transfer Southern Pacific's construction and radio licenses to GTE under Sections 214 and 310 of the Communications Act, 47 U.S.C. §§ 214, 310(d).

8.  The Department of Justice requested and GTE agreed that, because of the similarity of the issues with *AT & T,* the experience of the undersigned with the implementation of the decree in that case, and the desirability of consistent interpretations, this case be regarded as "related" to the *AT & T* case and be handled by the undersigned.

9.  After reviewing and evaluating comments from a number of sources, the Department clarified and further explained certain provisions of the proposed decree, made some minor amendments to its language, and stated again its belief that entry of the proposed decree was in the public interest.

Additionally, as also required by the Act, the Department published a summary of the terms of the proposed decree in the news media on May 12–18, 1983, and it published the complaint, the proposed final judgment, and the Competitive Impact Statement in the Federal Register, 48 Fed.Reg. 22020 (May 16, 1983).

10.  In order to compete effectively, firms providing interexchange telecommunications services must, of course, have access to the local distribution facilities, including both exchange switching and transmission facilities, if they are to reach the ultimate consumer. Absent strong prophylactic measures, a local monopoly has the power to discriminate against its long distance competitors with respect to such access.

11.  The complaint here also alleges that GTE, as a member of the "partnership" with AT & T (see note 22 *infra*) had an economic incentive to favor that company, and that this, too, had the effect of impeding competition in the interexchange telecommunications market.

petitors.[12]   Both the decree in *AT & T* and the decree herein also provide for the separation of the local operations from the competitive operations.   But the two decrees fundamentally differ with respect to the degree of separation required: in *AT & T,* the consent decree provided for and the Court ordered a complete structural separation, requiring AT & T to divest itself of the Bell Operating Companies, and prohibiting these companies from engaging in interexchange and information services.[13] The decree in this case, by contrast, permits GTE to enter the interexchange business (by acquiring Sprint) and to remain in the information services business even though it will also continue to engage in the local telephone business.   Instead of complete separation, the safeguard here adopted to protect against anticompetitive practices is the imposition, by way of an injunction, of various conditions and restrictions.

With the *AT & T* precedent fresh in the mind of the telecommunications industry, opponents of the proposed decree contend that here, too, nothing short of a complete separation will protect competition and the public: on that basis, they argue that it would be inconsistent with *AT & T* and illogical for the Court to approve the acquisition of Southern Pacific's telecommunications enterprises (including Sprint) by GTE. These opponents suggest that, notwithstanding the various conditions and restrictions incorporated in the decree, the merger in one company of Sprint's long distance and GTE's local telephone operations will permit GTE to stifle competition in the

interexchange and information markets through abuse of its local monopoly bottlenecks.

## B.   Differences from AT & T

The difference between the solution proposed by the Department of Justice with respect to the GTE lawsuit and that which was proposed by the Department and agreed to by the Court in *AT & T* thus lies at the heart of the determination the Court must make.   After careful consideration of that issue, the Court has concluded that, notwithstanding a number of similarities between the two cases, the factual differences between them are so substantial that it would not be justified in rejecting the decree proposed by the parties[14] on the basis of the *AT & T* precedent.   These differences may be summarized as follows.

First.   The telecommunications operations of a combined GTE-Sprint company differ markedly in size and scope from those of AT & T.   Prior to divestiture, the Bell System dominated every aspect of the telecommunications industry—its intercity enterprise served every one of its local monopolies, and in combination, they provided local telephone service to over eighty per cent of the nation's telephones.   Although, to be sure, Sprint (which began service in late 1973), is now the third largest interexchange carrier, even at that it accounts for only one per cent of all long distance telephone calls.[15]   Locally, GTE, through its ownership of seventeen Operating Companies, is the largest of the "inde-

---

**12.** The decree prohibits the GTE Operating Companies from discriminating not only in favor of Sprint but also in favor of AT & T.   See note 22, *infra.*

**13.**   In fact, the *AT & T* decree prohibits the Bell Operating Companies from engaging in any lines of business other than exchange telecommunications, exchange access, marketing of customer premises equipment, directory advertising, and monopoly services actually regulated by tariff.   552 F.Supp. at 227–28.

**14.**   As the Court stated in *AT & T,* "a lower standard of review must be applied in assessing proposed consent decrees than would be appropriate in other circumstances ...   For these

reasons, it has been said by some courts that a proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.' ... Although these decisions are not necessarily binding, this Court will follow a similar approach."   552 F.Supp. at 151 (citations and footnote omitted).

**15.**   In the interexchange telecommunications services market, AT & T remains by far the dominant firm, MCI being second with a market share of about three per cent.

pendent" telephone companies; yet it provides local exchange services to only eight per cent of the nation's telephones. Different standards are appropriately applied where there is this great a difference in size.[16]

Second. Unlike the Bell Companies which were dominant almost everywhere, the GTE companies are relatively thinly dispersed over 31 states. In fact, in terms of concentration, the GTE companies serve roughly half as many telephones per square mile as do the Bell Operating Companies.[17] This dispersion has, of course, substantial consequences in terms of monopoly control.[18] And, while the Bell Operating Companies serve the vast majority of the high-density, heavily-populated metropolitan areas (the areas most attractive to the interexchange carriers which are the potential long distance competitors), the GTE Operating Companies serve primarily the nation's rural and suburban areas.[19] The effect on potential competition of a local-long distance consolidation is thus likely to be quite different.[20]

Third. AT & T in its pre-divestiture mode was a vertically integrated company which had existed in its then-current form for more than a century. Its interexchange enterprise served every one of its local monopolies. In addition, the network which served both the local and intercity enterprises was characterized by predominantly common costs. In contrast, the GTE Operating Companies and Sprint have not enjoyed any previous relationship and they have no history of common costs.[21]

16. In determining whether a merger or acquisition is likely to lessen competition or tend to create a monopoly, courts have considered, among other factors, the market shares of the two firms, the absolute size of the firms and the industry, and the rank of the firms in their respective markets and the industry. See, *e.g.*, *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974); *Ford Motor Co. v. United States*, 405 U.S. 562, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972); and *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). As the Supreme Court has held, however, an acquisition must be "functionally viewed, in the context of its particular industry." This means that, in addition to sales, market shares, and other quantitative factors, the competitive structure and history of the particular industry must also be examined to determine the probable anticompetitive effect of the acquisition. *Brown Shoe Co. v. United States, supra*, 370 U.S. at 321–22, 82 S.Ct. at 1521–22.

17. To be sure, in some areas GTE's control over the local telephone exchanges is more concentrated than these statistics indicate. For example, California and Florida together account for approximately one third of GTE's total telephone revenues, and eleven per cent of GTE's end offices account for fifty-two per cent of its traffic. However, these aberrations do not undermine the general conclusions stated above.

18. The bulk of the nation's long distance traffic is made up of calls to and from cities served by the Bell Regional Holding Companies, and significantly fewer calls are made to areas served by the GTE Operating Company network. See also Part II(C), *infra*.

19. The Department of Justice, citing to an earlier AT & T study, stated that about 140 or 144 cities in the United States account for approximately eighty-eight per cent of all intercity traffic. Of the GTE-served cities, only a few are included in the list of the top 144 cities. (Transcript of Hearing on November 22, 1983 at 41–42).

20. When the government filed its antitrust action against GTE, the Sprint network served only the following ten markets in which the GTE Operating Companies were the local exchange providers: Durham, North Carolina; Erie, Pennsylvania; Fort Wayne, Indiana; Honolulu, Hawaii (see Part VII, *infra*); Lexington, Kentucky; Ontario, California; San Bernadino, California; Santa Barbara, California; Tampa, Florida, and York, Pennsylvania. Thus, even if GTE has the incentive to discriminate in favor of Sprint, it would presently have the ability to do so at most in those ten markets—a potential threat to competition of a far lesser magnitude than that presented by the ubiquitous Bell System.

21. MCI contends that the absence of prior common operations between GTE and Sprint is not a legitimate basis for refusing to mandate a complete structural separation, arguing that the AT & T decree required not only the separation of the local Operating Companies from AT & T but also prohibited these companies from providing interexchange services. This requirement, it is said, could not have been based on the common operations rationale.

While that observation is accurate, it still does not mitigate the other vast differences between

For this reason, the separation requirements as applied to the GTE Operating Companies may be expected to have greater efficacy and to be easier to police than they would have been if applied to AT & T in lieu of divestiture.

Fourth. Any discrimination in favor of Sprint that deviated from or violated the proposed decree's equal access and nondiscrimination requirements would be relatively easy to detect. The technical interconnection arrangements between the Operating Companies and the Sprint enterprise—unlike the comparable arrangements within the Bell System—do not antedate the entry of competing carriers, and discrimination in favor of Sprint's and against the other interexchange carriers would therefore be more readily identified. Moreover, GTE's implementation of equal access will be judged not only against the requirements of the decree, but also against two objective benchmarks: (1) the Bell Operating Companies' provision of equal access; and (2) the provision of equal access by the

GTE Operating Companies in the cities not served by Sprint.

Fifth. The GTE Operating Companies have a long-standing partnership with AT & T.[22] As a member of that partnership, GTE had an incentive to favor AT & T, and it is claimed to have acquiesced in AT & T's various allegedly anticompetitive activities.[23] By requiring the GTE Operating Companies to terminate their partnership with AT & T, the decree will tend to remove GTE's incentive and ability to favor that company which has frustrated the achievement of a more competitive interexchange market.[24]

Sixth. In addition to the dissolution of the AT & T–GTE partnership, GTE's acquisition of Sprint has other procompetitive aspects not present in the AT & T situation which must also be weighed in the balance. That acquisition may actually increase competition in the interexchange telecommunications market because it will enable GTE, a financially strong and vigorous firm, to enter the long distance field and to provide Sprint with the capital investment it needs

the two corporations and their local Operating Companies. See also note 18, *supra*. Moreover, the decree in the instant case also provides prophylactic relief in this regard, for it, too, prohibits the Operating Companies from providing interexchange services. See section V(C)(1) ("No GTOC shall provide interexchange telecommunications services or own, individually or jointly with GTE or any other person, facilities that are used to provide such services"); see also section IV(A)(6).

22. GTE, as a provider of local telephone services, participated in a joint venture (commonly known in the telecommunications industry as the "partnership") with AT & T Long Lines, the Bell Operating Companies, and other independent operating companies for the provision of intercity telecommunications services. Revenues from interexchange services were allocated among the members of the partnership through "settlements" or division of revenues which provided a common rate of return to all partnership members on the aggregate, undepreciated investment of each member in interexchange telecommunications switching and transmission facilities—it was not based upon either the volume of telecommunications traffic transmitted by, or the value of telecommunications or exchange access services provided by a partnership member.

23. The Department of Justice has claimed that since at least 1973, members of the partnership have actively prevented interexchange carriers other than AT & T from fully and equally interconnecting their networks with partnership facilities; that they have resisted demands from other carriers for nondiscriminatory access to the essential local switching and transmission facilities controlled by partnership members; and that GTE has never offered exchange access to the other interexchange carriers equivalent to that provided by the GTE Operating Companies to the partnership. These practices are claimed to have prevented other interexchange carriers from providing services in competition with the partnership and to have impeded competition for the provision of interexchange telecommunications services.

24. Section V(C) of the decree prohibits the GTE Operating Companies from providing any interexchange telecommunications services and from owning facilities that are used to provide such services. Thus, GTE's investment in the partnership is capped at its present level. Sections V(C)(2), (3), and (4), which are integrally related to the prohibitions in section V(C)(1), provide several alternative methods by which the Operating Companies may phase out their existing interexchange operations over a transition period.

to compete vigorously with AT & T, still the dominant force in that market.[25]

■ For. these reasons,[26] the Court concludes that the GTE situation is sufficiently different from that which was before the Court when it was presented with a consent decree in *AT & T* that the public interest does not necessarily require here the remedy that was adopted there.[27] The Court accordingly will not reject the acquisition by GTE of the Southern Pacific affiliates, including the Sprint operations, on the basis merely of the *AT & T* precedent.

## C. Regional Companies

There is a second AT & T-related problem, however, and it is more troubling. Those who oppose the GTE acquisition argue as follows. Whatever may be the gen-

uine differences between GTE and the Bell System as a whole, no such differences exist between GTE and the Regional Holding Companies, the inheritors of the Bell System's local monopoly operations. The real comparison that must be made, therefore, is between GTE and these Bell companies, and on that basis GTE has been treated far more favorably than have its Bell counterparts. Unlike the Bell companies, GTE is allowed, under its decree, to offer both local monopoly and competitive interexchange and information services (albeit in separate subsidiaries, see *infra*), whereas the Bell Regional Holding Companies are restricted to local telephone service and are strictly forbidden, under the *AT & T* decree, to engage in interexchange and information services on any basis.[28]

---

**25.** Indeed, it was because Southern Pacific was unable or unwilling to infuse substantial additional capital into Sprint's network that it agreed to sell its telecommunications enterprises to GTE. GTE has advised both the Department of Justice and the FCC that it plans to invest approximately $5.4 billion over the next ten years ($2.5 billion will be invested between 1983 and 1985), and that it expects to increase Sprint's current one per cent market share to eight per cent by 1993. (GTE Brief at 6).

**26.** GTE asserts that it is also different from AT & T because "it has not been shown to have engaged in the anticompetitive practices proved against AT & T, and it is not even charged in this action with any such practices" (Response of GTE Corp. to Comments on Proposed Settlement at 16). This is not a proper basis for distinguishing the two cases.

First, the *AT & T* case was settled before the Court could draw any definitive conclusions concerning either the sufficiency of the government's evidence to sustain a finding of liability or the validity of AT & T's various legal and factual defenses. See 552 F.Supp. at 161. Thus, no finding was made as to whether AT & T engaged in anticompetitive activities which violated the antitrust laws. Indeed, section III of the AT & T decree specifically provides that the judgment "shall [not] constitute any evidence against, an admission by, or an estoppel against any party or [Bell Operating Company]."

Second, it is claimed by some that GTE has a similar history of anticompetitive behavior. For example, MCI states that GTE has provided it with inferior quality interconnections, delayed interconnections, inadequately served and repaired existing MCI circuits, and engaged in a whole host of other anti-competitive activities. MCI also cites to a number of antitrust actions

in which GTE was named as the defendant. The Department of Justice has similarly alleged that GTE, as a member of the AT & T partnership, engaged in conduct which had the effect of impeding competition in the interexchange telecommunications services market.

**27.** A total separation of the GTE local operations from the Sprint interexchange operations would obviously protect antitrust interests most securely. However, as indicated above, the Court's role in a Tunney Act proceeding is not to require adoption of a remedy which it regards as perfect, or the one it might have imposed had there been a final judgment finding antitrust violations; it is simply to determine whether the decree meets the requirements for an antitrust remedy—that is, whether it effectively opens the relevant markets to competition and prevents the recurrence of anticompetitive activity without imposing undue and unnecessary burdens upon other aspects of the public interest. 552 F.Supp. at 153. See also note 42, *infra*.

**28.** The Department of Justice which, of course, negotiated both decrees, has opposed on the basis of the strict monopoly-competitive dichotomy in the Bell situation, even such departures as the Court's requirement that the Bell Operating Companies be allowed to market customer premises equipment. Because the Department was sufficiently concerned about the differences in treatment, it informed the Court that, should the Court be unable to discern a valid distinction between GTE and the Bell Regional Holding Companies in this context, the Department would prefer to have the GTE decree disapproved rather than to have the Court jettison the restrictions on the Bell companies. (Transcript of Hearing at 59).

These arguments have substantial weight, and the Court has considered them with great care. Ultimately, however, it has concluded that it was not improper for the Department of Justice to agree to and for the Court to approve (see note 14, *supra*) a separate subsidiary solution here while insisting in the context of the Bell System situation on the remedy of a strict divestiture.

To be sure, in some significant respects, particularly size and scope of operations, GTE more or less matches the Bell Regional Holding Companies (at least the smaller ones). In other ways, however, the two types of entities differ to some substantial degree.

Each of the Bell regional companies has a very strong, dominant position in local telecommunications in the area in which it serves; GTE's operations, by contrast, are widely scattered.[29] Moreover, the Regional Holding Companies also have the facilities to provide all the intercity and inter-LATA traffic throughout their regions, while the GTE Operating Companies control little by way of intercity facilities, and what facilities they do have are by and large of the entrance type which do not cover the areas in which the companies operate. (Transcript of Hearing at 40–41). Finally, internal planning documents of GTE and Sprint indicate that Sprint's interexchange network will, even by 1985 or 1986, reach only sixteen GTE cities (Transcript of Hearing at 42), and the Department of Justice has observed that of all access lines in existence, only one or two per cent are in GTE cities, and that Sprint has the fewest of these. (Transcript of Hearing at 41). All these factors suggest that entry by other interexchange carriers into the local markets dominated by GTE is far less likely

and the anticompetitive effects of improper GTE actions will be both less probable and more easily detectable.

Because of these differences, and because of its relatively limited role in considering a consent decree (as distinguished from the responsibilities it would have in entering a judgment after a finding of liability), the Court has concluded that it would not be justified in rejecting the proffered decree on the basis of the Regional Holding Company precedent. However, the issue is a close one, and the Court has reached its decision only because of the strictness and firmness of the decree's injunctive and separate-subsidiary provisions.[30]

The Court accordingly now turns to these provisions.

### III

*Safeguards Against Improper Conduct*
*A. Cross-Subsidization*

As discussed *supra*, in any situation where both competitive and monopoly services are offered over jointly-owned or jointly-operated facilities, there is a significant danger of cross-subsidization which will harm competitors and competition in the unregulated competitive markets.[31] The decree deals with this problem primarily by requiring GTE to maintain total separation within the corporation between the local Operating Companies and the newly-acquired Southern Pacific companies,[32] as follows.

Section IV prohibits the Operating Companies from (1) transferring to or obtaining from the acquired entities any assets, operations, or lines of business;[33] (2) maintain-

---

**29.** See also note 18, *supra*. Although the Regional Holding Companies together serve eighty per cent of the nation's telephones, they serve only thirty-two per cent of its land area.

**30.** In fact, to the extent that the parties' proposal weakens the separate-subsidiary safeguard, the Court cannot and will not approve it. See Part IV, *infra*.

**31.** Cross-subsidization could, of course, also harm Operating Company ratepayers.

**32.** *I.e.*, Sprint.

**33.** This separation requirement is subject to the exceptions set out in subsections IV(D) and (E). Subsection IV(D) permits GTE to reorganize its corporate structure by transferring to or consol-

ing with the acquired entities common directors, officers, or employees (other than the chief executive officer and the president of GTE), common facilities or assets, or common books of accounts, costs, or expenditures; (3) providing to or using for the benefit of the acquired entities any proprietary Operating Company telecommunications information; (4) furnishing to or receiving from the acquired entities any administrative,[34] engineering, research and development, or similar services;[35] (5) providing jointly with the acquired entities telecommunications or information services, or jointly owning with them the assets used to provide such services; and (6) marketing or identifying their services with those of the acquired entities (except that the Operating Companies may inform their subscribers in a nondiscriminatory manner of the services offered by the interexchange carriers).[36]

In the same vein, the proposed decree also limits financial and other interactions between GTE and the acquired entities. Section IV(A)(5) requires that all financing of these entities be provided directly by GTE, its wholly-owned financing affiliates, or unaffiliated sources. Under section IV(A)(7), the acquired entities may obtain services, information, and products from other GTE affiliates (other than the Operating Companies) only pursuant to contracts, and "on terms and conditions no

more favorable than such services, information, and products are offered to the [Operating Companies]". Finally, the acquired entities must pay the fully allocated cost of any services, information, and products obtained from a GTE affiliate that are not offered by the affiliate to the Operating Companies. Section IV(A)(7)(b). In brief, the decree prohibits even the more indirect, subtle vehicles for cross-subsidization that are ordinarily the most difficult to detect.[37]

These requirements will make it difficult for GTE to intermingle the operations and finances of the Operating Companies and the acquired entities, and will increase the likelihood that any cross-subsidization from the regulated monopoly to the competitive operations would be detected. In addition, section IX of the decree grants to the Department of Justice extensive rights of investigation to ensure that GTE, the Operating Companies, and the acquired entities comply with these, and all other provisions of the decree.

The Court concludes, on the basis of all the cited provisions, that the decree adequately guards against the risks of anticompetitive cross-subsidization.

### B. Discrimination

The acquisition of Sprint by GTE is claimed by opponents of the decree to threaten competition in the interexchange

idating with the acquired entities all of its unregulated operations currently provided by GTE affiliates operating in unregulated markets. Subsection IV(E) authorizes GTE to transfer from its Operating Companies customer premises equipment and any unregulated exchange telecommunications service.

34. The term "administrative services" in section IV(A)(4) includes, among other things, common buildings, trucks, garages, warehousing, and other supply-related facilities.

35. The acquired entities are likewise prohibited from providing such services to any Operating Company. This requirement, which is subject to an exception of some limited overhead administrative expenses (which GTE must report to the Department of Justice), is designed to eliminate virtually all possible avenues for common cost sharing.

It is to be noted that GTE generally allocates its administrative and research expenses not related to a specific function among its subsidiaries in proportion to their revenues. Those expenses that are related to a specific function are allocated to that subsidiary.

36. This does not prevent either the acquired entities or the Operating Companies from being separately identified with GTE.

37. In addition to the provisions in the proposed decree, the FCC's order approving the acquisition includes a condition prohibiting the Operating Companies from discriminating in favor of Sprint in the provision of exchange access or any other services or facilities. Application of GTE Corp. and Southern Pacific Co. to Transfer Control of South Pacific Communications Co., No. ENF–83–1, FCC 83–269; FCC Order Approving Acquisition (July 1, 1983); Condition 3, p. 71.

market because that acquisition gives GTE both the incentive and the opportunity to use its control over the local monopolies to discriminate in favor of its own interexchange carrier, Sprint. Section V(B) deals specifically with this problem by prohibiting the Operating Companies from discriminating against the various interexchange carriers in the (1) establishment and dissemination of technical information and interconnection standards; (2) interconnection and use of exchange services and facilities, or the charges for each element of service; and (3) provision of new exchange access and the planning for and implementation of the construction or modification of facilities used to provide such access.[38]

Again, while these provisions, and the separate-subsidiary requirements discussed above, are not as efficacious as requirements totally separating the GTE Operating Companies from Sprint and GTE's other competitive operations, for the reasons discussed above, the Court believes that they are adequate, under these circumstances, to protect competition and competitors from discriminatory activity.

The decree has also been criticized by its opponents on the ground that it will facilitate continued collusion between GTE and AT & T based on their longstanding partnership (see note 22, *supra*). In fact, not only does the decree not enhance the potential for GTE–AT & T collusion, it diminishes it, for it requires the Operating Companies to terminate their partnership over a transition period.[39]

## C. Reduced Competition

MCI argues that, should the Court approve GTE's acquisition of Sprint, addition-

al competition in interexchange telecommunications will be foreclosed because it is improbable that any new firm will enter the market *de novo*. It is obviously uncertain how the interexchange market will develop—what firms will enter and what firms will be forced out by economic pressures. Within that framework, it is true that GTE's acquisition of Sprint eliminates the possibility that GTE will enter the market as a separate interexchange competitor (in addition to Sprint),[40] and in theory this reduces competition. But the injury is truly theoretical only. Because substantial capital is needed for *de novo* entry, it is unlikely that GTE would actually have entered the interexchange market on its own. In any event, even if GTE had done just that, its internal expansion into the market would have posed virtually the same dangers to competition as does its acquisition of Sprint. In short, any reduction in competition resulting from that acquisition is speculative, and it is offset, moreover, by the decree's equal access and non-discrimination provisions, as well as by the requirement that GTE must terminate its longstanding partnership with AT & T. All of these are of course developments which will tend to promote competition in the interexchange market.

Finally, section VI of the decree prohibits GTE for a ten-year period from acquiring either directly or indirectly an equity interest in, or the assets of, any other carrier providing interexchange telecommunications services in the United States. Thus, any further GTE growth in the interexchange market must come from internal expansion rather than by merger or acqui-

**38.** As discussed in detail in Part V, *infra,* Section V(A) also requires each GTE Operating Company to provide all interexchange carriers exchange access and services for such access on an "unbundled, tariffed basis, that is equal in type, quality and price".

**39.** Section V(C) prohibits the Operating Companies from providing any interexchange telecommunications services and from owning facilities that are used to provide such services, thus capping GTE's investment in the partnership at its present level. Sections V(C)(2), (3), and (4),

provide several alternative methods by which the Operating Companies may phase out their existing interexchange operations over a transition period.

**40.** According to MCI, GTE originally contemplated entering the long distant market by developing its own business from within by using its four satellites which the FCC had approved for launch beginning in 1984. In September, 1982, GTE instead decided to enter the market by acquiring Sprint.

sition. It may be that a subsequent horizontal merger between GTE-Sprint and another interexchange carrier ten years hence could pose additional dangers to competition.[41] That, however, is an issue for another day when the precise facts of any such merger, the size of the to-be-acquired company, and the then-existing competitive conditions may be evaluated. The Court finds that the ten-year ban on GTE acquisitions of other interexchange carriers further and adequately reduces the risk that competition in the interexchange telecommunications market will be significantly foreclosed.

### D. Future Divestiture

Section VII(B) of the decree specifies that the Court may, upon Department of Justice application, order further relief including the divestiture from the new merged company of either Sprint or, at the election of GTE, the Operating Companies. This relief may be granted if GTE engages in a pattern of substantial violations of the separate-subsidiary requirements (section IV), the equal access or non-discrimination obligations (section V), or the schedule for phased-in equal access (Appendix B), or if any GTE Operating Company violates these provisions in a manner that materially injures the ability of interexchange carriers or information providers to compete with GTE or Sprint.

This is obviously a very significant provision, for it establishes a relatively quick, certain remedy in the event that GTE or

one of its affiliates engages in anticompetitive conduct notwithstanding the injunctive provisions of the decree. The Department of Justice, moreover, has assured the Court that it will not hesitate to seek divestiture under this section if that should be necessary or appropriate to ensure continued progress toward a competitive telecommunications industry.

■ The decree does not, however, specify the standards which will govern the Court either in making findings of violations sufficient to order a subsequent divestiture or in determining whether such violations have occurred. The Department of Justice, at oral argument, explained its understanding of what standards and procedures would apply in a proceeding pursuant to section VII(B). However, an enforcement provision as important as this, which could give rise to many different constructions if the occasion for its exercise ever arose, requires more clarity and certainty than a mere statement in an oral hearing. Accordingly, as a prerequisite to its approval of the decree,[42] the Court will require that the parties incorporate into the decree the Department's representations to the Court concerning section VII(B).

This additional provision (see Part VIII, *infra*), shall include the following. In any proceeding under section VII(B), the government will have the burden of proving by a preponderance of the evidence that GTE or a GTE Operating Company violated the decree either by engaging in a

---

**41.** Although the vertical integration of the operations of the Operating Companies with those of Sprint may have some adverse effects on competition, it is not expected to increase market concentration in either the local exchange or the interexchange markets or to eliminate competitors from such markets. See generally 3 Von Kalinowski, *Antitrust Laws and Trade Regulations* at § 17.03[3].

**42.** Although the Department of Justice appears to intimate otherwise (Response of the United States to Comments at 4 n. 4), the Court's authority under the Tunney Act to refuse to approve a decree which it finds not to be in the public interest can hardly be questioned. See 552 F.Supp. at 151; Note, The Scope of Judicial Review of Consent Decrees Under the Antitrust Procedures and Penalties Act of 1974, 82 Mich.

L.Rev. 153, 162–63 (1983). Certainly, the balancing of competing social interests involved in settling an antitrust suit is left, in the first instance, to the Attorney General. *United States v. Bechtel Corp.,* 648 F.2d 660, 666 (9th Cir. 1981). But in light of the history and purpose of the Tunney Act, it is abundantly clear that the courts were not to be mere rubber stamps, accepting whatever the parties might present. Thus, here as in *AT & T,* the Court has deferred to the decisions of the parties as expressed in the decree, and it has presumed that each of the terms and conditions of the decree as well as of the decree as a whole are reasonable. At the same time, the Court has refused to accept or approve those provisions which it does not find to meet the public interest standard (see *United States v. AT & T, supra,* 552 F.Supp. at 147–53).

pattern of substantial violations or by violating the decree in a manner which materially injures competitors, as described in that section. The government would not have to show that the conduct rose to the level of a violation of the antitrust laws;[43] it would not have to establish the relevant product or geographic market; it would not have to show that a pattern of substantial violations by GTE injured competition or any competitors; and it would, of course, not be required to prove damages. Finally, if the Department demonstrated one of the factual predicates set out in section VII(B) and the Court ordered divestiture, the GTE Operating Companies would nevertheless continue to be bound by the remaining injunctive provisions of the decree.[44]

With the exception just noted, the Court finds that the various provisions of the decree contain appropriate safeguards against improper conduct, and that the sanction of divestiture, in particular, provides a significant deterrent against noncompliance.[45] At the same time, because the decree permits GTE to merge its local monopoly enterprise with a long distance enterprise, these provisions are necessary to prevent anticompetitive conduct. The Court therefore concludes that these provisions are in the public interest.

## IV

### Information Services

As is true with respect to AT & T, the provision of information services[46] by GTE

creates a substantial probability that it may monopolize such services in markets where it is also engaged in the local exchange business.[47]

In fact, because technology-advanced information services, which are expected eventually to be among the most profitable aspects of the telecommunications industry, are only beginning to be marketed commercially on a significant scale, their provision by a local exchange monopolist poses perhaps an even greater threat to competition than does a monopolist's participation in the interexchange market. As the Court stated in *AT & T*, if the Operating Companies were excluded from the information services market,

> [T]hey will have an incentive, as time goes on, to design their local networks to accommodate the maximum number of information service providers, since the greater the number of carriers the greater will be the Operating Companies' earnings from access fees. Thus, competition will be encouraged from the outset. If, however, the Operating Companies were permitted to provide their own information services, their incentive would be the precise opposite: it would be to design their local networks to discourage competitors, and thus to thwart the development of a healthy, competitive market. 552 F.Supp. at 189–90 (footnotes omitted).

For these reasons, the Court approved in *AT & T* a complete ban on the provision of

---

43. If a showing of such a violation were required, section VII(B) would be meaningless.

44. Transcript of Hearing at 49. Thus, the GTE Operating Companies would continue to be required to grant full equal access and to treat all interexchange carriers on a nondiscriminatory basis even though GTE no longer owned Sprint.

45. In addition, the decree does not immunize GTE from an otherwise appropriate action under the antitrust laws.

46. Broadly speaking, information services are the generation, processing, and making available information which may be conveyed by telecommunications, *e.g.*, videotext, some forms of electronic mail, electronic publishing services, data processing services, telephone-operated

burglar alarm systems, and some office management systems.

47. The Court noted in *AT & T* that information services are provided directly via the telecommunications network. The Operating Companies would therefore have the same incentives and the same ability to discriminate against competing information service providers that they would have with respect to competing interexchange carriers. Here, too, the Operating Companies could discriminate by providing more favorable access to the local network for their own information services than to those provided by competitors, and they could subsidize the prices of their services with revenues from the local exchange monopoly. 552 F.Supp. at 189.

information services by the Bell Operating Companies. Here, on the other hand, while the GTE Operating Companies—like the Bell Companies—may not provide interexchange services, they are, unlike the Bell Companies, permitted to render information services [48] under certain conditions: they must do so through separate entities (either a separate subsidiary or a separate division); [49] and they must give access to their local exchange networks to all information service providers on an equal and non-discriminatory basis.

These provisions are adequately prophylactic and, for the same reasons as those discussed above for permitting GTE to engage in the interexchange business, the continued participation of GTE in the information business will also be approved. The decree is defective in one respect, however.

Insofar as information services are concerned, section V(D)(3)(a) specifies that even the minimal separation requirements [50] will automatically expire five years [51] after entry of the decree. [52] No persuasive explanation has been given either by the Department of Justice or by GTE for this provision. Yet that provision has serious anticompetitive potential.

In the first place, as discussed above (see Part II(C), *supra* ), GTE is being treated by its decree far more leniently with respect to separation requirements and line of business restrictions than are the Bell Regional Holding Companies under their decree. More importantly, if, as the parties evidently assume—and the Court certainly does— there is a need for the separation provisions now, there will be a similar need for them five years from now unless significant economic or technological changes occur in the information services or telecommunications markets to undermine the Operating Companies' competitive posture. No one has suggested—much less demonstrated—that such changes are likely to

---

**48.** The GTE Operating Companies, unlike the Bell Operating Companies, may also engage in any line of business, related or unrelated to telecommunications, subject to the decree's requirement of structural separation between its exchange operations and its intercity and information services businesses.

**49.** The separate entity may obtain telecommunications services, telecommunications facilities, and billing services from a GTE Operating Company only to the extent that such services are available to other non-affiliated firms on an unbundled, tariffed bases. Similarly, the separate entity may obtain administrative and other services from a GTE Operating Company only on the same terms and conditions that such services are available to non-affiliated firms. If, however the Operating Company services are proprietary (provided that they do not fall within the prohibited categories listed below) and are not offered to non-affiliated firms, the separate information subsidiary may obtain them only at a price which, at a minimum, exceeds their fully allocated costs. Finally, the separate information subsidiary or division may not, directly or indirectly, obtain proprietary Operating Company marketing, customer, or network engineering information.

**50.** Unlike interexchange services, which are prohibited to the GTE Operating Companies and may be provided only by GTE itself, information services may be provided by the Operating Companies (albeit subject to the conditions described above).

**51.** The Operating Companies may be freed altogether of the separation obligations before the end of the five-year period if, and to the extent that, the Bell Operating Companies are permitted to offer information services. Thus, if a Bell Operating Company is permitted to provide a particular information service in a state or an exchange area, the separation obligations of the decree in this case will no longer bind a GTE Operating Company that offers these same services in the same State or in its exchange area associated with the Bell exchange area.

**52.** Section V(D)(3)(a) provides that the five-year deadline may be extended upon application by the Department of Justice. Any such application is required to be made at least one year prior to the five-year expiration date and may be made as to one or more categories of information services. In order to extend the limitations under this section, the Court must find by a preponderance of the evidence that, without the continuance of the limitations, there is a substantial danger that competition in the particular information service market will be substantially lessened. In making this determination, the Court must consider, among other things, the development of competition and potential competition in the provision of exchange telecommunications facilities and services.

occur within the next five years.[53] In short, there is no more justification for a five-year automatic expiration of the separation requirements governing the Operating Companies' provision of information services than there would be with respect to the separation provisions governing the provisions of interexchange services. Indeed, in the information services field, the automatic expiration of these requirements would only enhance whatever competitive advantages the GTE Operating Companies now have over competing information service providers or would-be competitors: these companies could then provide jointly both information and local exchange services, and nothing could prevent them from cross-subsidizing the competitive operations. The Court concludes that there is no reasonable basis for the five-year termination provision and that this provision is not in the public interest.

Accordingly, as a prerequisite to its approval, the Court will require the parties to modify the proposed decree to eliminate the automatic five year expiration date for the separation obligations of section V(D)(2).[54] This does not mean that the separation obligations will apply in perpetutity, but only that they will remain in effect until GTE is able to demonstrate that there is no substantial possibility that it could use its monopoly power to impede competition in the information services market or until a similarly situated Bell Operating Company has made such a showing and is permitted to offer information services.

## V

### Equal Access

Section V(A) of the decree requires GTE to provide to all interexchange carriers and information service providers "access ... that is equal in type, quality, and price."[55] The non-discrimination provisions of section V(B) reinforce this obligation by prohibiting the Operating Companies from discriminating in favor of GTE affiliates providing interexchange telecommunications services, information services, and customer premises equipment with respect to interconnection, technical information, exchange access services, and planning for new facilities and service.

These equal access and non-discrimination provisions are likely to extend a significant benefit both to the public and to GTE's competitors, and they represent a significant step forward toward the creation of a more competitive environment in the telecommunications industry—a step, moreover, which would not be possible without the decree. Not surprisingly, therefore, no one has criticized the decree's general guarantee of equal treatment of all interexchange carriers. However, two of the interexchange carriers,[56] have taken exception to the timetable and the manner in which equal access will be phased in. Their objections will now be considered.

In its Competitive Impact Statement, the Department of Justice explained that the equal access provisions of the decree are based upon three basic principles: (1) the Operating Companies are to have flexibility to provide equal exchange access in the manner and with the facilities they deem most efficient; (2) notwithstanding this flexibility, each company must meet specified performance and pricing criteria to ensure the availability of equal access; (3) because of the present configuration of the GTE network and the unavailability of soft-

---

**53.** Recognizing this fact, the AT & T decree specifies that the line of business restrictions on the Operating Companies, including the prohibition against the provision of information services, could be removed only if the rationale therefor was outmoded by technical developments or by changes in the structures of the relevant markets. 552 F.Supp. at 194–95.

**54.** See note 42, *supra.*

**55.** The features of full equal access are: (1) dialing parity; (2) rotary dial access; (3) network control signalling; (4) answer supervision; (5) automatic calling number identification; (6) carrier access codes; (7) directory services; (8) testing and maintenance of facilities; (9) provision of information necessary to bill customers; and (10) presubscription. Response of GTE, Affidavit of William E. Starkey, at paragraph 2.

**56.** *I.e.,* MCI and Satellite Business Systems.

ware and switching equipment needed to modify it, the Operating Companies should be given a transition period in which to phase in the equal exchange access requirements.

Appendix B of the decree sets out in some detail GTE's equal access obligations based upon these principles. Specifically, each GTE Operating Company must provide access to all interexchange carriers and information service providers equal in type and quality to that provided AT & T or other interexchange carriers as promptly as possible, but in no event later than twelve months after receiving a written request therefor from any interexchange carrier other than AT & T.[57] Paragraph (A)(1)(a) prescribes a schedule for offering equal access through end offices employing specific types of switches, subject to the general twelve month obligation,[58] and paragraphs (A)(1)(b) and (c) require GTE to equip a progressively increasing proportion of its end offices with switches technologically capable of providing equal access. Under this schedule, GTE must offer equal access through end offices serving at least two thirds of its exchange access lines by September 1, 1987, and through all Operating Companies end offices serving more than 10,000 lines by December 31, 1990.[59]

MCI and SBS argue that the Appendix B timetable is less rigorous than that required in the *AT & T* decree, and that GTE could provide more comprehensive equal access in less time than the decree allots. In fact, however, the equal access schedule here is, in at least one significant respect, more stringent than that imposed on the Bell Operating Companies. The *AT & T* decree requires the Bell Operating Companies to begin offering equal access by September 1, 1984—some 32 months from the filing of the decree and 24 months from its entry. By contrast, the decree in this case requires the GTE Operating Companies to begin offering equal access by January 1, 1985, only 19 months from the filing of the decree and only four months after the Bell Operating Companies must begin offering equal access. In other words, the Bell companies, which have access to AT & T's vastly superior resources, will actually have had several more months than their GTE counterparts in which to develop the software needed to transform their network into an equal access network.

This is so despite the significant demographic differences between the GTE and the Bell Operating Company service areas, as well as differences in the types of switching equipment owned by these companies—both of which significantly limit GTE's equal access capabilities. As observed above, the Bell Operating Companies serve virtually all the major metropolitan areas (which account for a substantial majority of interexchange traffic), while the GTE Operating Companies serve generally smaller, less densely populated areas, and for that reason they have not attracted significant entry or demand for entry by interexchange carriers other than AT & T. In addition, the GTE Operating Companies possess fewer advanced switching systems than do the Bell Operating Companies, and

**57.** This requirement applies to all Operating Company end offices which employ switches technologically capable of providing equal access or for which the capability of providing equal access is commercially available.

**58.** SBS contends that GTE could provide equal access, particularly through stored program control switches (see Appendix B(A)(1)(a)(i)), on a more expedited basis because even if it were unable to develop its own software, it could allegedly obtain such software from AT & T (which is the in the process of developing software for upgrading its switches that are similar to the GTE switches). However, it appears that the software needed to transform the re-spective networks is not interchangeable between analogous, but different switches even in those instances where the switches are produced by the same manufacturer. In any event, such software is proprietary and there is no guarantee that AT & T would provide it to its competitor Automatic Electric (GTE's manufacturing subsidiary).

**59.** The requirements of paragraphs (A)(1)(b) and (c) may be suspended if, because of changed circumstances not reasonably foreseeable, it is no longer economically feasible to install at a particular end office a switch technologically capable of providing equal exchange access.

they lack the traffic and demand necessary to support a rapid conversion to more sophisticated facilities.[60] What relatively minor scheduling differences do exist between the two decrees are therefore amply warranted by these differences.[61]

In short, the schedule in the decree provides the GTE Operating Companies with the proper requirements and incentives to provide equal access expeditiously, while granting them the flexibility to accomplish the task in the manner that they deem most efficient.

MCI and SBS also question the equal access transition provisions, claiming that GTE should be required, in advance of equal access, to improve the quality of access for other interexchange carriers in those areas where it has the capacity to do so.[62] While it is conceivable that GTE could enhance the interconnections of other interexchange carriers prior to its implementation of full equal access, the Department of Justice has suggested—and the Court agrees—that interim arrangements for enhanced interconnection be left to the negotiations of the interested interexchange and exchange carriers. It is impossible to know exactly and to impose with specificity those interim arrangements which are technically and economically feasible while omitting those which might actually delay the overall implementation of full equal access.[63] Accordingly, the Court will not require GTE to enter into specific interim arrangements.[64]

The Court concludes that, if it were to require the changes requested by the com-

60. As indicated above, in order to meet its equal access obligations, GTE must replace many of its existing step-by-step switches and other electromechanical switches with more technologically advanced switches.

61. The Court notes that the equal access implementation schedules in the proposed decree specify the latest permissible date on which the GTE Operating Companies must meet the specified access criteria, and that, since the decree requires them to offer equal access "as promptly as possible" (Appendix B(A)(1)), they are required to advance the implementation of equal access if the necessary software and hardware become available sooner than anticipated.

62. That is, where GTE has a toll switch and toll quality trunks connecting its switch with the end office. SBS argues that if sufficient capacity exists or could efficiently be added to handle the additional interexchange carrier traffic, GTE could route all interexchange traffic through its existing switches and toll grade trunks without any software changes or significant added costs.

63. Recognizing that "a variety of approaches will in all probability be necessary to achieve equal access", the Court similarly refused to impose any additional or different conditions on the Bell Operating Companies in the *AT & T* case. 552 F.Supp. at 197.

64. MCI and SBS also criticize the proposed decree's exemption from the phased-in provision of equal exchange access for (1) exchange areas served by Operating Company end offices employing step-by-step switches and (2) end offices serving less than 10,000 access lines. This criticism stems from a misunderstanding of these exemptions.

The step-by-step exemption is subject to two conditions. First, GTE must comply with the phased-in schedule in paragraph (A)(1) of Appendix B, and this includes the obligation that it replace all step-by-step switches (which cannot furnish equal access) with electronic switches in those end offices serving more than 10,000 access lines by the deadlines set forth in the decree, but in no event later than 1990. Second, at end offices serving less than 10,000 access lines and employing electromechanical switches (largely step-by-step switches), the Operating Companies must provide a commercially available trunkside interconnect arrangement to all interexchange carriers, "unless such access is not physically possible except at costs that clearly outweigh potential benefits to users of telecommunications services". Paragraph (A)(1) of Appendix B. Thus, while in end offices serving fewer than 10,000 access lines the decree does not require GTE to replace its existing step-by-step technology within a specified time, it does require GTE to develop, if feasible, improved means of interconnection for interexchange carriers with these switches until they are ultimately replaced.

As for the exemption for small end offices, MCI and SBS erroneously assume that all end offices serving less than 10,000 exchange access lines, regardless of the switch technology in place at these offices, are exempt from the equal access requirements. That is not correct. The decree expressly requires all Operating Companies to furnish equal access through any end office with an electronic switch no later than the dates specified in Appendix B(A)(1)(a). Thus, if an Operating Company end office serving less than 10,000 access lines is presently using a DMS–100 switch, it must offer equal exchange access not later than January 1, 1985.

peting interexchange carriers (*e.g.*, to compel GTE to treat all end offices alike and to impose more stringent schedules), it would create inefficiencies and impose additional costs on the Operating Companies without achieving superior results. The Court therefore finds the requirements and the proposed schedule for the implementation of equal access to be appropriate, and it will approve them in their entirety.

## VI

### *Operating Company Exchange Areas*

#### A. *Exchange Area Size*

In compliance with section II(H) of the decree, GTE submitted to the Department of Justice and filed with the Court a list of local exchange areas.[65] Each GTE exchange area[66] is required to meet specified criteria[67] which are identical to those applied in the *AT & T* case for the establishment of the Bell Operating Company LATAs. See 552 F.Supp. at 229.

MCI objects to the application of these criteria in this case, arguing that in *AT & T,* the Court approved many LATAs which were larger than the local calling service areas only as a means of ensuring the financial viability of the Bell Operating Companies, and that this consideration is irrelevant here because GTE, unlike AT & T, made an independent business decision to acquire Sprint while at the same time retaining its Operating Companies. That being so, it is said, the Court should not be concerned with the financial viability of the GTE Operating Companies, and it should not permit them to compete outside their local calling areas in toll and long-distance markets.

If the financial viability of the Bell Operating Companies had been the only or even the predominant factor the Court considered in determining the appropriate size of the Bell LATAs, MCI's argument might have some persuasiveness.[68] That, how-

---

**65.** These local exchange areas serve the same function as do the local access and transport areas (LATAs) under the *AT & T* case.

**66.** Section II(H) defines "exchange areas". An "exchange area" is a geographic area "established by a GOTC within which the GTOC has the facilities and capability ... to provide traffic switching above end offices and delivery and receipt of such traffic at a point or points designated by an interexchange carrier within such exchange areas for the connection of its facilities with those of the GTOC." A "serving area" is a geographic area not within an exchange area and in which the Operating Company does not have the facilities and capability described above, but in which it provides exchange telecommunications and exchange access services. In such serving areas, the Operating Companies do not have control transmission and switching facilities necessary to provide the access services required for equal access to all interexchange carriers. Accordingly, under section A(2) of Appendix B, they are not required to provide such services other than by their direct transmission facilities. However, they must use their best efforts to obtain from another carrier having the facilities and capability (generally, a Bell Operating Company), the exchange access functions it is relieved from providing.

Exchange areas and serving areas delineate the division between exchange and interexchange functions and are therefore directly related to the proposed decree's prohibition against the provision by the Operating Compa-

nies of interexchange services and facilities (section V(C)(1)) and the equal exchange access requirements of section V(A) and Appendix B.

**67.** These criteria are as follows:

1. Any such exchange area shall encompass one or more contiguous local exchange areas serving common social, economic, or other purposes, even where such configuration transcends municipal or other local governmental boundaries, and shall take into consideration BOC exchange areas and associated serving areas approved by the Court in *United States v. Western Electric Co.,* 569 F.Supp. 990 (D.D. C.1983);

2. No such area which includes part or all of one metropolitan statistical area (or a consolidated statistical area, in the case of densely populated states) shall include a substantial part of any other metropolitan statistical area (or consolidated statistical area, in the case of densely populated states), unless the Court shall allow; and

3. Except with approval of the Court, no exchange area located in one state shall include any point located within another state. Section II(H)(1)–(3).

**68.** Indeed, it should also be noted in support of the MCI position that GTE represented to the FCC that its acquisition of Sprint would in no way impair the financial viability of the Operating Companies. See *In Re Application of GTE Corp. and Southern Pacific Co. for Consent to*

ever, was not the case. In fact, the Court considered a number of other factors, including the existing configuration of the telecommunications networks, the inefficiencies that would result if they were divided or rearranged, and the lack of competitive entry into remote regions of the country. *United States v. Western Electric Co.,* 569 F.Supp. 990, 996, 1004 (D.D.C. 1983).

In any event, the term "financial viability" does not have the narrow connotation MCI ascribes to it. As the Court observed in *AT & T,* the establishment of larger exchange areas tends not only to assist the profit picture of the Operating Companies: it tends also to decrease the pressure for local rate increases.[69] Thus, properly viewed, the continued viability of the GTE Operating Companies is in the public interest not merely for the sake of these companies themselves but also because it may help keep down local telephone rates for their customers.

In addition to these considerations which apply equally to AT & T and GTE, the rationale for establishing relatively small exchange areas (which favor the interexchange competitors) is even less compelling here than it was in the *AT & T* case. As

discussed above, the GTE Operating Companies are generally smaller than the Bell Operating Companies, they serve less densely populated regions, they own a limited number of advanced switching systems, and they lack the traffic to generate demand for access by many interexchange carriers. For these reasons, their exchange areas must be of substantial size if they are to attract interexchange carriers: it is unlikely that such carriers would be willing to make the significant investment required to build the facilities needed to provide telecommunications services between the smaller exchange areas. See 569 F.Supp. at 1004 n. 62.[70] The Court therefore finds that the criteria for establishing exchange and serving areas in the proposed decree are reasonable and will adequately protect the public interest.

## B. West Virginia

As concerns specific exchange and serving area proposals, only one entity—the Public Service Commission of West Virginia—has filed an objection.[71] The Department of Justice, in its response to public comments, explained the reasons for the proposed associations in question to the satisfaction of the Court.[72] Moreover, if

---

*Transfer for Control of SPCC and SPSC,* No. ENF–83–1. Slip op. at 15 (FCC July 1, 1983).

**69.** This is so for two reasons: first, the larger the exchange area, the more intrastate toll traffic will be intra-LATA or intra-exchange area, generating a significant source of revenue for the Operating Companies. Second, the establishment of larger exchange areas is more likely to result in greater efficiencies in the provision of exchange services and avoid significant rearrangement costs that would otherwise be incurred if integrated local networks were severed by LATA or exchange boundaries.

**70.** The Court noted in the *AT & T* case that larger LATAs have some pro-competitive features, including their tendency to reduce the number of facilities AT & T's competitors would have to build. 569 F.Supp. at 995–996 n. 24, 1004. This reasoning also applies in the case of GTE.

**71.** The Michigan Public Service Commission filed comments requesting that the Court approve GTE's proposed designations and affilia-

tions of Operating Company exchange areas in Michigan. MCI indicated in its response that it intended to submit comments on GTE's proposed exchange areas after it had an adequate opportunity to study the plan thoroughly (Response at 48 n.*). No such comments were ever filed.

**72.** Based on the present toll facilities configuration, GTE proposed to associate ten of its West Virginia exchanges with the Bell Clarksburg, West Virginia LATA. However, according to West Virginia, C & P Telephone Co. intends to reconfigure its facilities and assign two of its central offices (Keyser and Piedmont) which are presently homed in on the Clarksburg Class 4 switch, to its Hagerstown, Maryland LATA. Because the vast majority of traffic from the ten West Virginia exchanges is directed to Keyser, Piedmont, or Maryland exchanges in the Hagerstown LATA, West Virginia maintains that these ten exchanges should not be permanently associated with the Clarksburg LATA, but should be assigned to the Hagerstown LATA. In the alternative, West Virginia suggests that the Court allow sufficient flexibility to permit

any particular network is reconfigured in that State, the GTE Operating Company may apply to the Department of Justice and to the Court for any necessary changes in the exchange area.[73]

### C. Relationship to Bell LATAs

Both AT & T and the Department of Justice have raised the issue of the effect on GTE's proposed exchange and serving areas of the Court's decisions in the *AT & T* case concerning the association of Bell LATAs with adjacent operating areas of independent telephone companies, including those of GTE. As AT & T correctly observes,[74] a number of GTE's proposals differ from Bell Operating Company classifications of Bell-Independent traffic and of the resulting Bell association of independent telephone company territory with Bell LATAs. Both AT & T and the Department of Justice contend that the Court's July 8, 1983 decision in the *AT & T* case, and presumably any modifications thereto, are dispositive of all questions relating to Bell LATAs and their association with adjacent independent territory. The Court agrees. The decree in this case provides that the GTE Operating Company exchange areas "shall take into consideration [Bell Operating Company] exchange areas and associated serving areas approved by the Court in *United States v. Western Electric Co.* [569

F.Supp. 990] (D.D.C. [1983])." Section II(H)(1).[75] To the extent, therefore, that GTE's exchange area submission differs from the Court's rulings in the *AT & T* case concerning the association or disassociation of a GTE Operating Company territory with a Bell Operating Company LATA, it must be modified accordingly.

### D. Final Decisions on Exchange Areas

Section II(H) provides that "GTE shall *submit to the Department of Justice for its approval, and file with the Court,* a list of its proposed exchange areas" (emphasis supplied). MCI maintains that, in spite of this language, it is the Court, rather than the Department of Justice, which has the authority to approve the exchange areas and the association of serving areas. No party has objected to that interpretation.[76] Moreover, paragraphs (2) and (3) of subsection II(H) stipulate that no exchange area which includes part or all of one metropolitan statistical area (or a consolidated statistical area, in the case of densely populated states) shall include a substantial part of any other metropolitan area "unless the Court shall allow," and that "except with the approval of the Court," no exchange area located in one state shall include any point located within another state.

---

the reassociation of these exchanges when the network is reconfigured.

The Department of Justice contends—and the Court agrees—that, because of the present configuration of the facilities these ten exchanges are properly associated at the present time with the Clarksburg LATA, rather than with the Hagerstown LATA. However, the proposed decree does provide for the flexibility sought by West Virginia by requiring the Operating Companies to apply to the Department of Justice and to the Court for any necessary changes in exchange or serving areas, or in associations when the present network is reconfigured. See note 73, *infra.*

**73.** Section II(H) requires that when and where the criteria for an exchange area are met in the future, the Operating Company shall establish additional or different exchange areas with the approval of the Department of Justice and the Court.

**74.** Comments of AT&T at 4 n.*.

**75.** See also sections II(I), (P), and (R) of the decree which likewise refer to Bell Operating Company exchange areas and associations approved by the Court in the *AT & T* case.

**76.** To the contrary. In its Competitive Impact Statement, the Department of Justice explained that "GTE is required to submit to the Department for its approval a list of all exchange areas, by July 5, 1983, which will permit the Court to make reference to GTE's proposed exchange areas in making its determination whether the proposed judgment is in the public interest". CIS at 22.

In its own submission, GTE states that the configurations and associations of its exchange and service areas comply with the standards of the proposed decree, avoid unnecessary reconfigurations of the network and facilities, and observe the existing communities of interest. On that basis, it has requested the Court to accept the proposed exchange and service areas as filed.

The Court notes that, except for the West Virginia problem discussed above, the Department has not commented on the proposed configuration of the exchange areas. While the language of the decree is certainly not unambiguous, it appears that, pursuant to its basic authority to pass upon the settlement under the Tunney Act, the Court has both the authority and the duty to determine whether the proposed exchange and service areas meet the criteria discussed *supra* and are in the public interest. For the reasons stated, these areas are approved as submitted.

## VII

### *Hawaii*

In addition to the general effect GTE's acquisition of Sprint will have on telecommunications services throughout the United States, it will have a special impact on these services in the State of Hawaii. The dominant provider of telecommunications services in that State is the Hawaiian Telephone Company (HTC), a GTE Operating Company. Not only is that company the monopoly provider of local exchange services but it is also (in partnership with AT & T) the overwhelmingly dominant provider of telephone service between Hawaii and the United States mainland.[77]

The State of Hawaii has vigorously urged upon the Court that the decree, as presently drafted, will adversely affect the public interest with respect to that State in two principal respects: (1) by prohibiting HTC, like all other GTE Operating Companies, from providing interexchange services, it will cause serious service disruptions and local rate increases; and (2) by permitting GTE to consolidate the domestic interexchange operations of HTC with those of Sprint, it will eliminate the only existing competition in the Hawaii-Mainland market to the detriment of Hawaii consumers. The first of these concerns rests upon a misunderstanding of the effects of the decree and is therefore not well-taken; the second is more serious, and steps must be taken to address it.

First. The State of Hawaii contends that, should HTC be barred from the interexchange market, other carriers, which presently possess only a negligible share of the Hawaii-Mainland market, will not be able to absorb immediately the HTC traffic, causing serious disruptions in service to the Hawaiian public.[78] In addition, Hawaii is concerned that HTC's loss of revenues from interexchange services as a result of its exclusion from those services will result in dramatic rate increases for local services and will substantially impair the financial viability of HTC.[79]

For the many reasons discussed above, section V(C) of the decree prohibits each GTE Operating Company from engaging in the interexchange market. HTC, like all Operating Companies, is therefore required to withdraw from that market; it may not provide interexchange services;[80] and it is forbidden to own, individually or jointly with GTE or any other entity, any additional facilities that are used to provide such services.[81] These provisions are an essential ingredient of the anticompetitive thrust

---

**77.** HTC is also the major provider of Hawaiian-Mainland private line service, the monopoly provider of Hawaii's international service, and the provider of interexchange services between Hawaii and United States overseas points, including Guam, American Samoa, and the Northern Mariana Islands.

**78.** Under GTE's July 5, 1983 Exchange Area Submission, Hawaii would constitute a distinct exchange area. Thus, the decree would not affect HTC's intrastate services.

**79.** Hawaii estimates that HTC's revenues for interstate services in 1982 were $164.2 million

($28.1 million of this was from international operations), and that in 1983 HTC would incur only $71.8 million in operating expenses for the provision of such services. In comparison, HTC's expected revenues for local exchange services in 1983 were $140 million, but its operating expenses were estimated to be approximately $101 million.

**80.** Section V(C)(1), however, expressly permits HTC to continue to offer international telecommunications services.

**81.** HTC must phase out its existing interexchange operations.

of the decree, and the Court will not reject them.

It does not follow, however, that Hawaii's fears have substance or are likely to be realized. The decree's mandate will neither disrupt service nor will it gernerate local rate increases. Interexchange telecommunications services would be disrupted only if AT & T, Sprint, and MCI all abandoned their interexchange services between Hawaii and the Mainland—an entirely implausible scenario. Sprint and MCI now provide such services, albeit on a relatively small scale, and they may be presumed to be eager to expand their business. One of the options under the decree would be for AT & T to take over the interexchange services it now provides jointly with HTC and, should that occur, there would be no disruption of service whatsoever. In any event, it is inconceivable that none of the interexchange carriers currently providing service in the Hawaii-Mainland market—or new entrants—would not eagerly and quickly assume whatever share of the market HTC relinquished.[82]

As for the question of HTC revenues (and the concomitant issue of local rates), the interstate carriers will, of course, compensate HTC by means of tariffed access charges for the services it provides.[83]

Second. Historically, Hawaii has had higher rates, fewer services, and less competition in telecommunications than the Mainland States.[84] It was only in May of last year that Sprint, in a major move toward a more competitive environment, began to provide interexchange service between Hawaii and the Mainland in competition with HTC, charging rates significantly lower than HTC's. Hawaii argues that the acquisition by GTE (the parent of HTC) of HTC's aggressive, second-place competitor will seriously threaten the existence of a competitive Hawaii-Mainland market. The State further maintains that, should the interexchange facilities[85] of the two affiliates of an enlarged GTE be combined, directly or indirectly, the favorable developments to be expected from Sprint's entry into the market would quickly vanish,[86] and competition would be snuffed out just as it is taking shape. On that basis, the State urges the Court to condition its approval of the decree on a prohibition of the consolidation by GTE of the interexchange facilities of HTC with those of the acquired entities (i.e., Sprint).

GTE and the Department of Justice have given different and somewhat contradictory responses to the dilemma posed by Hawaii. The former simply sweeps the problem under the rug, stating that it "does not

---

**82.** The decree contains ample safeguards against a disruption of service and provides different methods of funding to the Operating Companies for the use of their interexchange and switching facilities. Thus, HTC is authorized to phase out its existing interexchange operations during a transition period by leasing its interexchange facilities to AT & T (section V(C)(2)); by continuing, for a period of time, its existing division of revenue arrangements (section V(C)(3)); or by providing its interexchange capacity to all carriers on a non-discriminatory basis (section V(C)(4)). Hawaii concedes that to the extent that one of these options is quickly implemented and generates revenue for HTC, any shortfall would be lessened. Comments of the State of Hawaii at 10 n. 19.

**83.** See Affidavit of Donald M. Kuyper, President of HTC, at paragraphs 8–10 (Appendix B to GTE's Response Brief). In any event, the FCC in 1981 ordered that Hawaii-Mainland toll rates be reduced and integrated into the Mainland toll rate structure. In order to avoid the unduly

rapid adverse impact that such a reduction in revenue would have on HTC, a transitional plan was developed which provided HTC with supplemental revenue. The rate integration process will be completed (and the transitional supplements will end) in 1984 and HTC's rate-of-return for its interstate operations must thereafter be equal to the national average. Docket No. 21263, Report and Order, FCC 81–312 (1981).

**84.** Comments of the State of Hawaii, Transcript of Hearing at 62.

**85.** The parties have in this context used the terms "facilities" and "operations" interchangeably. What is involved here are HTC's routing and transmission capacity provided by facilities used to provide interexchange service. See section V(C)(2)–(4) of the decree; Competitive Impact Statement at 18–20.

**86.** In fact, others, such as MCI, would have an even more difficult time competing with an entrenched GTE-Sprint.

intend" to consolidate HTC's interexchange operations with Sprint.[87] The response of the Department of Justice is not much more satisfactory.

Under section IV(D)(1)(e) of the decree, the Department may grant GTE an exemption from the general prohibition on the transfer of assets, operations, or lines of business from an Operating Company to an acquired entity (*i.e.*, Sprint). In view of this provision, says Hawaii, GTE, notwithstanding its present professions of intention, could merge the interexchange facilities of HTC with those of Sprint by a stroke of the pen, provided only that it receives the approval of the Department. The future of competition in the Hawaii-Mainland market thus lies squarely in the hands of the Department of Justice. The Department, when confronted with this question, initially advised the Court that it believed that a consolidation of the HTC-Sprint interexchange operations would not raise serious anticompetitive problems, and that it would therefore in all likelihood approve it.[88] Later, the Department changed its position and stated that it would "probably not approve such a transfer after all."[89]

These various expressions of intention are not enough either to resolve Hawaii's legitimate concerns or to protect it from the serious anti-competitive consequences that would arise from a consolidation of the HTC-Sprint interexchange facilities. The decree herein, no less than the decree in *AT & T*, must pry open to competition[90] those segments of the telecommunications market where such competition is technologically feasible, and it must do so in a practical, realistic way. It is obvious that the merger of HTC's facilities with those of Sprint in the Hawaii-Mainland market would instead threaten the competitive environment in that market—a market which has barely begun to experience competition.

For these reasons, the Court has decided that it must acquiesce in the request of Hawaii that it be protected from a consolidation of the HTC-Sprint facilities by a modification of the decree. A modification of the decree itself—as distinguished from the various verbal assurances of GTE and the Department of Justice—will guarantee with more certainty than does the present record that the acquisition will not lessen competition or tend to create a monopoly in the Hawaii-Mainland market—the very type of anticompetitive effect that the government alleged in its complaint.

Accordingly, before the Court approves the settlement as in the public interest, it will require the parties[91] to modify the decree to incorporate their commitment to Hawaii and to the Court that the interexchange facilities of HTC will not be transferred to or consolidated with those of the acquired entities.

Hawaii has also sought clarification and further commitments from the parties on a number of other subjects. However, after carefully considering these matters,[92] the

---

**87.** Transcript of Hearing, November 22, 1983, at 34–35.

**88.** Department of Justice Comments at 23.

**89.** Transcript of Hearing at 52. The Department further noted, however, that if GTE wanted to transfer only those HTC facilities that would not create a competitive problem, it might approve it after all.

**90.** In this instance, it is the preservation of competition, not its continuation, that is at issue.

**91.** See note 42, *supra.*

**92.** First, the decree specifically exempts telecommunications services between Hawaii and points outside the United States from the prohibition against the Operating Companies' provision of interexchange services. The State of Hawaii questions whether services between Hawaii and United States-controlled Northern Mariana Islands are included within this exemption, and whether HTC will continue to provide interexchange services between Hawaii and domestic points such as Puerto Rico and the Virgin Islands. Both the Department and GTE agree that the exception for HTC's international operations includes services between Hawaii and U.S. controlled Northern Mariana Islands, and that HTC may continue to provide services to Puerto Rico and the Virgin Islands.

Second, because of the particular competitive situation in Hawaii, the FCC, in conditionally approving the acquisition, required Sprint to

Court has concluded that, with the exception noted above, the decree sufficiently protects the public interest with respect to Hawaii and that further modification is not warranted.

## VIII

### Conclusion

The decree in this case will continue the transformation, begun with *United States v. AT & T*, from a telecommunications industry dominated by a monopoly enterprise to one in which competition determines price, quality, growth, and innovation. Both the *AT & T* decree and the decree in this case have a common purpose: to prevent the defendant companies from impeding competition, by the use of local telecommunications monopoly bottlenecks, in markets where such competition is technologically feasible. To achieve that objective, each decree contains provisions designed to prevent the local Operating Companies from discriminating in favor of their own affiliates engaged in competitive enterprises and from subsidizing these enterprises with profits derived from monopoly operations.

The two decrees adopt different structural models to that end. The *AT & T* decree required total separation of the Bell Operating Companies from AT & T's competitive enterprises by a surgical divestiture. The *GTE* decree permits the GTE Corporation to engage in both competitive and monopoly enterprises subject, however, to a number of separate-affiliate requirements and injunctive provisions, capped by a grant of authority to the Department of Justice to return to the Court to seek divestiture in the event that GTE nevertheless engages in anticompetitive behavior.

Notwithstanding the strict requirements in the decree, before the Court, there is no blinking at the fact that GTE is being allowed to do what AT & T was not—to provide simultaneously both local monopoly and competitive long distance services. Despite the seeming inconsistency, the

provide services between Hawaii and all Mainland points at rates and on terms comparable to those within the contiguous states. Hawaii argues that before the Court approves the acquisition, it should impose this same condition. The imposition of such a condition not only is unnecessary because the FCC's order has the full force of law, but it would require the Court to monitor on an on-going basis the constantly changing competitive rate structures—a task it is unwilling and unable to undertake.

Third, section V(A) of the decree requires each Operating Company to provide equal access to all interexchange carriers and information services providers, but it does not specify which entity or entities should bear the costs. Hawaii argues that, as in the case of AT & T, the costs of providing equal access—which benefits the interexchange carriers and information service providers—should be borne by GTE rather than by the Operating Companies. That argument is not well taken. Unlike the *AT & T* case, GTE will retain control over the Operating Companies and the reasons for imposing such a requirement upon AT & T are therefore inapplicable.

Fourth, in a similar vein, Hawaii seeks clarification on what, if any, division of interexchange and exchange facilities is required by the proposed decree, and it suggests that GTE be required to provide a plan of reorganization similar to that provided by the parties in the *AT & T* case, describing with particularity the planned utilization of HTC's interexchange facilities and any distribution or division of assets. Such clarification is likewise unnecessary here because there will be no division of assets between GTE and the Operating Companies.

Fifth, Hawaii seeks clarification as to the time when the requirement of section V(C)(1) which prohibits the Operating Companies from providing interexchange services will become effective. Hawaii maintains that if HTC is required to terminate such services between Hawaii and the Mainland immediately, it would violate section 214 of the Communications Act, which requires FCC authorization before any carrier can discontinue service. Hawaii believes that FCC approval is also required to implement GTE's other options concerning HTC's interexchange facilities. Accordingly, the State argues that the Court should defer consideration of the decree until the necessary FCC authorizations are obtained and the parties have implemented the terms of the proposed decree. GTE and the Department of Justice agree that FCC approval of license transfers is required before HTC may discontinue its interexchange business, and that it is unlikely that the FCC will approve discontinuance until a substitute provider is ready to take over such service without serious disruptions or rate increases. In any event, possible future FCC proceedings do not constitute a basis for delaying the Court's obligation under the Tunney Act to determine whether the proposed decree is in the public interest.

Court has concluded that—except for some limited changes—it would not be justified in rejecting the settlement negotiated between GTE and the Department of Justice as being contrary to the public interest. GTE is simply not the Bell System: it lacks the vast market domination of that System that would enable it to engage in anticompetitive practices irrespective of injunctions and separate affiliate provisions; the GTE Operating Companies and Sprint have not been, and will not be, fully integrated, with common facilities, personnel, and joint and common costs; and GTE's local operations are not only widely dispersed but they also exist primarily in markets not as attractive to long distance competitors as are those of the Bell Companies.

Additionally, the GTE-Sprint merger as limited by the decree presents positive, procompetitive aspects. GTE's financial backing will permit Sprint to become a real competitor in the long distance telecommunications market, a market in which one company—(AT & T)—still retains an overwhelmingly dominant share. Similarly, the phased elimination of the AT & T–GTE partnership as well as the guarantees of equal access and nondiscrimination will significantly further the goal of a fully competitive industry. All of these developments are consistent with the objective of the antitrust laws and they support the goal this Court has sought to achieve both here and in the *AT & T* case: vigorous, flourishing competition in the telecommunications market, to the benefit of the American public and the American economy in an industry that is central to the information age.

▮ For these reasons, the Court finds that, with the limited exceptions listed below,[93] the decree submitted to the Court by the parties will adequately prevent GTE from engaging in the anticompetitive activities alleged in the complaint and will open up the relevant markets to competition. Their proposal will therefore be approved by the Court as in the public interest, provided that the parties agree to the addition of the modifications to be included in the following new section:[94]

## XI

### *Modifications*

A. When seeking relief under section VII(B), the United States is not required to demonstrate that the conduct of GTE or a GTOC rises to the level of an antitrust violation, and it need not establish the relevant product and geographic markets in which competition is harmed. In the event that the Court finds that GTE or a GTOC has violated the decree in the manner set forth in that section and orders further relief, the GTOCs will continue to be bound by all the injunctive provisions of this Final Judgment. Nothing herein immunizes the activities of GTE, the GTOCs, or the acquired entities from the operation of the antitrust laws.

B. Section V(D)(3)(a) is stricken and the limitations of section V(D)(2) shall be removed only upon a showing by the petitioning GTOC that there is no substantial possibility that it could use its monopoly power to impede competition in the information services market it seeks to enter, or as provided in section V(D)(3)(b).

C. Notwithstanding the provisions of section IV(D)(1)(e), GTE shall not be permitted to transfer, directly or indirectly, to the acquired entities the domestic interexchange operations or facilities of Hawaii Telephone Company.

---

**93.** The first modification would establish procedural and substantive guidelines to be followed in the event GTE or the GTE Operating Companies violate the decree and the government seeks to divest the Operating Companies or Sprint from GTE (see Part III(D)); the second modification would eliminate from the decree the provision which permits the GTE Operating Companies within five years to provide infor-

mation services directly, instead of through separate subsidiaries (Part IV); and the third modification would protect competition in the Hawaii-Mainland telecommunications market (Part VII).

**94.** The present section XI will thereafter become section XII.